# United States Court of Appeals
## For the First Circuit

No. 05-1395

STEPHEN M. RAKES; NICHOLE RAKES; MEREDITH RAKES;
COLBY RAKES; STIPPO'S, INC.; GARY W. CRUICKSHANK, as Trustee in
bankruptcy of Stephen M. Rakes,

Plaintiffs, Appellants,

v.

UNITED STATES,

Defendant, Appellee.

No. 05-1396

JULIE RAKES DAMMERS,

Plaintiff, Appellant,

v.

UNITED STATES,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Stahl, Senior Circuit Judge.

Douglas S. Brooks, with whom Paul V. Kelly was on brief, for Stephen M. Rakes et al.

Joseph F. McDowell III, with whom David S.V. Shirley and McDowell & Osburn, P.A., were on brief, for Julie Rakes Dammers.

Steve Frank, Attorney, Civil Division, U.S. Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Michael J. Sullivan, United States Attorney, Jeffrey S. Bucholtz, Deputy Assistant Attorney General, and Robert S. Greenspan, Attorney, Civil Division, were on brief, for the United States.

---

March 23, 2006

---

**STAHL**, __Senior Circuit Judge__. This case is the latest in a series of cases arising out of the unfortunate involvement of FBI Agent John Connolly with two Boston gangsters, James "Whitey" Bulger and Stephen "the Rifleman" Flemmi. Among the numerous crimes perpetrated by Bulger and Flemmi was their successful effort in 1984 to compel the plaintiffs in this action, Julie Rakes Dammers and Stephen Rakes, then married, to sell them their newly opened liquor store. Rakes and Dammers allege, and for purposes of these appeals we assume, that John Connolly, and therefore the U.S. government, bear some responsibility for the Rakeses' loss of their store.

Rakes and Dammers brought suit against the United States under the Federal Tort Claims Act (FTCA).[1] Because the extortion took place in 1984, and Rakes and Dammers did not file an administrative claim until May 11, 2001, the FTCA's two-year statute of limitations would bar this action if the claim had accrued on the date of the injury. In a long line of cases, we have held that the start of the FTCA's limitations period may be delayed during a period in which an injured party has no way of knowing that he has been injured or that it was the government who

---

[1]Rakes is joined as plaintiff by the trustee of his estate in bankruptcy, three family members, and a corporate entity. On appeal, these parties all appear to concede that the court's power to hear their derivative claims stands or falls with its jurisdiction over Stephen Rakes' own. For ease of understanding, we treat the case as if it involved only the principal plaintiffs, Stephen Rakes and Julie Dammers.

caused the injury. We have also frequently considered claims that a statute of limitations, asserted by the government in defense against a claim, should be tolled on the equities. The question on appeal is whether, under the discovery rule or under any tolling principle, the FTCA claim at issue here accrued before or after May 11, 1999. Finding that the claim accrued more than two years before Rakes and Dammers filed their claims, and that the statute of limitations was not tolled on grounds of duress or fraudulent concealment, we affirm the decision of the district court dismissing the case for lack of subject matter jurisdiction.

## I. Background

No factual question has been pressed on appeal, so we relate the facts as recounted by the district court, relying for some illustrative background information on earlier cases arising out of the same connection between the FBI and the Winter Hill Gang.

## A. Prehistory

Founded in the 1960s, the Winter Hill Gang operated as a criminal syndicate in Massachusetts and beyond until its operations were disrupted in 1999. Based originally in Somerville, Massachusetts, the Winter Hill Gang prospered through participation in a variety of illegal activities, including loan-sharking, bookmaking, trafficking in arms and narcotics, money laundering, and outright extortion. Over the years, as its members achieved

territorial dominance over areas that had been previously controlled by rival syndicates, among them La Cosa Nostra, which operated out of Boston's North End, the Winter Hill Gang broadened its reach to other locales. In particular, the group established a base of criminal operations in South Boston, and eventually conducted business from, among other places, a liquor store in that neighborhood known variously as the South Boston Liquor Mart, Columbia Wine and Spirits, and Stippo's Liquor Mart. This case involves the events that led up to the group's acquisition of that store.

Among the Winter Hill Gang's most notorious and powerful members were James J. Bulger, known as "Whitey," and Stephen Flemmi, known as "the Rifleman." Long before they attained prominence, both of these men became informants for the FBI. Flemmi was impressed into the service of the bureau in 1965, and was instrumental in bringing about its well-heralded success at prosecuting members of La Cosa Nostra, which was the dominant organized crime presence in Boston prior to the ascendance of the Winter Hill Gang. (Indeed, the FBI's successful campaign to fight La Cosa Nostra helped clear away the Winter Hill Gang's competition and contributed to Bulger and Flemmi becoming the renowned and powerful gangsters they became.) Bulger was convinced to become an informant in 1974. He was recruited to help the FBI in its crusade against La Cosa Nostra by his childhood acquaintance John Connolly,

who joined the FBI's Boston office as an agent in the Boston Organized Crime unit in the mid-1970s.

Over the years, John Connolly developed a close working relationship with Bulger and Flemmi, and took extraordinary steps to secure their continued availability to the FBI as informants against La Cosa Nostra. The details of the relationship between Connolly and Bulger and Flemmi were laid out by Judge Wolf in his opinion in United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999), and it is not necessary to this case to rehearse all of the particulars of their interactions. The crucial point is that on a number of occasions, Connolly crossed a critical line by offering sanction to Bulger and Flemmi's activities, and in so doing made the FBI a partner in some of the Winter Hill Gang's criminal enterprises. Through Connolly, the FBI offered Bulger and Flemmi virtual immunity from prosecution for a wide range of racketeering activities. See id. at 208-15. In this case, the plaintiffs' claims against the government are based in part on the free reign that Bulger and Flemmi enjoyed to further the interests of the Winter Hill Gang.

## B. The Liquor Store

In 1983, Stephen Rakes and Julie Rakes Dammers (then Julie Rakes: the couple divorced in 1990) opened a liquor store in South Boston, which they named "Stippo's Liquor Mart." In early 1984, Bulger and Flemmi evidently determined that the liquor store would be an ideal hub for their expanding illegal activities in

-5-

South Boston, and resolved to take it from the Rakeses. Bulger, Flemmi, and an associate of theirs named Kevin Weeks visited Rakes at the Rakeses' home in January of 1984.[2]

The three men "let themselves into" the Rakes residence. Bulger told Rakes that the three of them had been paid to kill him, and that although they had decided not to do so, they planned instead to buy his liquor store. Rakes said that the recently opened store was not for sale, and Bulger replied that, in that case, Bulger intended to become the Rakeses' partner in the store. Rakes explained that he and his wife did not want any partners. Bulger grew angry at the rebuff, threatened to kill Rakes and simply take his store, and left the house with his associates in tow.

The three men did not stay away for long. Later that evening, they returned to the house and made themselves comfortable around the kitchen table. They displayed weapons, a gun and a switchblade, and threatened to kill Rakes. Flemmi picked up Rakes' one-year-old daughter, stroked her hair, and said that "it would be

---

[2]There is no indication in the record whether the Rakeses and Bulger were acquainted with one another prior to the events at issue here or whether there was any particular animosity on Bulger's part that drove him to select the Rakeses' store. A 1998 Boston Globe article did suggest that "[w]e're talking about folks who travel in similar orbits here," noting that Stephen "Stippo" Rakes had a brother and sister who were rounded up in a raid on Bulger's cocaine distribution ring several years after the 1984 extortion of the liquor store. Joseph Lundbohm, Julie Rakes' uncle and once a detective with the Boston police, was, according to news reports in the record, later convicted on corruption charges related to Bulger's gambling ring.

a shame for her not to see her father again."  Eventually, having made clear that their threats were in earnest and that the Rakeses' lives were in danger, Bulger handed Rakes a brown paper bag containing roughly $65,000, stating that he would pay Rakes $25,000 more in the near future.[3]  Flemmi stated that the three gangsters had, with this transfer, become the new owners of the liquor store. They left the house.

In the next few weeks, the Rakeses fended off repeated attempts by Bulger and his men to force them to sign title to the liquor store over to Bulger.  In fear, the family fled to Florida for a short time to avoid the gang members.  After returning, they remained determined to keep their new store.

Julie Dammers' uncle, Joseph Lundbohm, was then a detective with the Boston Police Department.  The Rakeses turned to Lundbohm for advice and assistance in dealing with Bulger and his crew of thugs.  Lundbohm sought and received the Rakeses' permission to contact a friend on the FBI's Organized Crime squad. That friend turned out, to the Rakeses' misfortune, to be Agent John Connolly.  Connolly expressed hesitation about assisting the Rakeses.  He told Lundbohm that the FBI might be interested in helping the couple if they agreed to wear recording devices during conversations with Bulger and the others, but that if they did not

---

[3]This promise eventually proved worthless.  When Rakes later requested that Bulger at least pay the remaining $25,000, Bulger refused.

want to wear the wires, they would not be useful to the FBI and the FBI was therefore unlikely to do anything about the extortion.

Lundbohm told Connolly that he would advise the Rakeses not to wear the wires and that in any event they were unlikely to want to do so, given the obvious danger involved. Connolly said that he did not feel there was much that he or the FBI could do to help the Rakeses. Lundbohm returned to the Rakeses to report the dispiriting news.

Internal FBI regulations in effect at the time purportedly required that Connolly make a record of the contact and of the information provided to him by Lundbohm, and apprise his supervisor of the conversation. Connolly, however, made no record of the conversation, and told no one that Lundbohm had come to talk to him -- no one, that is, except for Whitey Bulger.

Connolly evidently reported to Bulger that Lundbohm had come to see him on the Rakeses' behalf. Bulger visited Rakes again and told him that he had better tell Lundbohm to "back off." Out of options, and running low on friends in law enforcement (in fact, the Rakeses believed at the time that it was Lundbohm himself who had told Bulger that the Rakeses were seeking help from the authorities), the Rakeses finally acceded to Bulger's demands and signed over title to the property.

## C. Subsequent Events & Newspaper Coverage

Because our disposition of the case turns in part on when, and the degree to which, certain facts were publicized, we

recount the subsequent events primarily as related in the local news media.

1.  1988 to 1990: Speculation

Newspaper coverage of the relationship between Connolly and Bulger and Flemmi began no later than September 20, 1988, when the Boston Globe reported that the FBI "has for years had a special relationship with Bulger that has divided law enforcement bitterly and poisoned relations among many investigators."  The Globe Spotlight Team, The Bulger Mystique: Law Enforcement Officials Lament about an Elusive Foe: Where Was Whitey?, Boston Globe, Sept. 20, 1988, at 18.  The Globe's speculations in that initial article and subsequent ones were, however, vehemently denied by the FBI. See, e.g., id. at 19 (quoting FBI's denial that the FBI gave any "special treatment" to Bulger); Dick Lehr, Finnerty Is Attorney for FBI Agent, Boston Globe, Mar. 24, 1989, at 16 (rejecting "the notion that Bulger has had relations with the bureau that have left him free of its scrutiny"); Dick Lehr & Kevin Cullen, Liquor Purchase Fuels Friction over FBI-Whitey Bulger Tie, Boston Globe, Nov. 11, 1990, at 44-45 (noting FBI's strong denials of any impropriety).  After this spate of reporting from 1988 to 1990, the papers became relatively quiet on the issue for a several years.

2.  1995-1998: The Flemmi Trial

In 1995, Flemmi and a number of other members of both the Winter Hill Gang and La Cosa Nostra, including Francis P. "Cadillac Frank" Salemme, were arrested on federal racketeering charges

-9-

following the obtaining of a set of indictments by the U.S. Attorney's office. Bulger was named in the indictments as well, but escaped before being arrested and fled the Boston area. At that time, the Globe reported that "[n]o one has ever shown the FBI to be an active protector of Bulger -- indeed, such a view is widely condemned as grossly unfair." Dick Lehr, Bulger's Flight Spares FBI Burden of Ties Being Aired, Insiders Say, Boston Globe, Mar. 5, 1995, at 24. It nevertheless suggested that Bulger's disappearance may have been convenient for the FBI, which might not have wanted a spotlight cast on its relationship with Bulger. Id. Reference to the FBI's light-handed treatment of Bulger also appeared in an August 1995 article in the Boston Herald, which reported that "federal officials repeatedly have ignored allegations Bulger has been coddled as a valuable stool pigeon." Joe Heaney, Do Irish Eyes Smile on Whitey?, Boston Herald, Aug. 13, 1995, at 14.

Subsequent to these articles came another period of relative quiet: the prosecutions of Flemmi, Salemme and the others crept forward, and significant news bearing on the instant case did not emerge until 1997. Then, in a front-page article that ran on June 26, 1997, the Globe reported on the "explosive" testimony of Stephen Flemmi in connection with the prosecutions under the 1995 indictments. See Patricia Nealon, Flemmi Says He, Bulger Got FBI's OK on Crimes, Boston Globe, June 26, 1997, at A1. The article led with the following statement: "Gangster turned informant Stephen J.

-10-

'The Rifleman' Flemmi asserted yesterday that an FBI contact assured him and his criminal partner, James J. 'Whitey' Bulger, they could continue to commit crimes -- short of murder -- without fear of prosecution."  Just below, it continued in greater detail:

> Flemmi, who ran the Winter Hill Gang with Bulger, described secret meetings at the Lexington home of FBI agent John Morris, who ran the bureau's organized crime squad here. At the meetings, Flemmi says, he and Bulger were all but given carte blanche to break the law.
>
> "Mr. Morris told Mr. Bulger and I that we could do anything we wanted so long as we didn't 'clip anyone,'" Flemmi's affidavit said.

Id.

That same article noted the FBI's slightly inconsistent responses to the accusation by Flemmi.  On the one hand, Barry W. Mawn, then head of the Boston office of the FBI, acknowledged that the FBI would follow procedure and investigate the claim.  Id.  On the other, Paul E. Coffey, then head of the Justice Department's Organized Crime and Racketeering Section, suggested that there was nothing for an investigation to find, reportedly asserting that "Flemmi and Bulger were warned periodically that they were not authorized to commit any crimes without specific permission -- something Coffey said they never received."  Id.  In December 1997, an article buried deep in the Boston Herald reported that Connolly and Morris had been cleared of any wrongdoing in an internal

-11-

Justice Department probe. See Ralph Ranalli, Justice Dept. Clears Ex-FBI Agents in Mob Case, Boston Herald, Dec. 5, 1997, at 24.

On January 7, 1998, the Herald reported in an inside story that "Winter Hill wiseguy and FBI informant Stephen 'The Rifleman' Flemmi said he was rewarded for his work for the agency with a free pass on murder, attempted murder and fugitive charges in the mid-1970s, defense lawyers alleged yesterday." Ralph Ranalli, Mobster: I Had a License to Kill; Flemmi Says FBI Knew He Was Murderer, Boston Herald, Jan. 7, 1998, at 6. A metro section piece in the Boston Globe on January 9, 1998 detailed the FBI's reluctance to assist the federal Drug Enforcement Administration (DEA) in an investigation of cocaine trafficking by Bulger and Flemmi. Patricia Nealon, FBI Loyalty to Mob Duo is Detailed; DEA, Others Kept in Dark About Bulger, Flemmi Ties, Boston Globe, Jan. 9, 1998, at B1. Five days later, another article tucked inside in the Herald noted again that Flemmi had asserted that the FBI gave him immunity in exchange for useful information. See David Weber, Flemmi's Lawyer Contends Fed Let His Crimes Slide, Boston Herald, Jan. 14, 1998, at 10.

3. 1998: Stephen Rakes' Perjury Trial

In 1998, Stephen Rakes was tried for perjury for falsely claiming in earlier grand jury testimony that he had voluntarily signed his family's store over to Bulger.[4] A front-page article in

---

[4]Stephen Rakes was summoned to appear before federal grand juries in 1991 and 1995. On both occasions, members of the Winter Hill Gang contacted Rakes before his appearance, and cautioned him

the Globe on May 28, 1998, ran during the trial and recounted the Rakeses' story.  See Shelley Murphy, Mobster's Takeover of Store Recounted, Boston Globe, May 28, 1998, at A1.  The article made reference to the ironic fact that the FBI agent to whom the Rakeses turned for help back in 1984 was Bulger and Flemmi's handler, and noted that Connolly was not able to recall whether he had reported the contact with Lundbohm to his supervisor, but made no direct suggestion of FBI impropriety.  See id.  In testimony to the grand jury before trial and again at the trial itself, Julie Dammers addressed the facts surrounding the 1984 extortion of the liquor store and the later investigation into Stephen Rakes' perjury.  On May 29, 1998, the fourth day of Rakes' trial, Rakes' defense counsel asked Dammers about one of her interactions with an Internal Revenue Service agent named David Lazarus, who was investigating the perjury.  The colloquy ran as follows:

> Attorney: Did Mr. Lazarus say anything about Whitey Bulger and Stephen Flemmi during the conversation?
>
> Dammers: Yes.  I said that they knew everything because Whitey Bulger was under their protective custody, and he -- and I said, "And that was your office," and he said "No, it wasn't his office."

---

that he should testify that his decision to transfer the liquor store to Bulger in 1984 was voluntarily taken, and on both occasions he ultimately so testified.  Rakes' false statements before the grand jury evidently frustrated federal officials who would have used the testimony to prosecute Bulger and others.  Rakes was indicted, tried, and convicted of perjury on the basis of his false grand jury testimony.

> Attorney: Did he explain to you when he said
> "No, it wasn't his office," who did he blame?
>
> Dammers: The FBI.[5]

(emphasis added).

Two days later, the Globe ran a story about Dammers' testimony at the trial of her former husband, noting that Dammers "said she argued with IRS special agent David Lazarus, who is assigned to the case, over how the government had protected Bulger while prosecuting Stephen Rakes." Shelley Murphy, Woman Says Bulger Shielded, but Husband Charged, Boston Globe, May 30, 1998, at B6. A story in the next day's Herald reported that Julie Dammers had in her testimony characterized Bulger as being in the government's "protective custody." David Weber, Merchant's Ex-wife Details Mob Buyout, Boston Herald, May 31, 1998, at 5.

A June 17, 1998 article reported Lundbohm's testimony that, after Lundbohm went to speak to Connolly about the liquor store extortion, "Connolly allegedly tipped off Bulger." Dick Lehr, Ex-detective's Testimony OK'd in Perjury Trial, Boston Globe, June 17, 1998, at F12. See also David Weber, Whitey Told Store Owner to 'Back Off' from Authorities, Boston Herald, June 17, 1998, at 32 (reporting that, in testimony, Lundbohm said he believed that "Bulger had some knowledge of the conversation with

_____

[5]On objection by the prosecuting attorney, the trial judge ordered the answer to the second question stricken, and the jury in the case therefore did not consider it. It nevertheless is a part of the record for purposes of these appeals.

-14-

Mr. Connolly").  A Globe article on June 25, 1998 reported on

Rakes' perjury conviction and noted that:

> With a prison term looming, the MBTA worker
> [Rakes] may face a dimmer future than either
> Bulger or Flemmi, both of whom worked as FBI
> informants for years.  Flemmi is arguing in
> federal court that the FBI granted him
> immunity from prosecution, while Bulger is a
> fugitive.

Marcella Bombardieri, Jury Convicts Man of Perjury for Denying

Gangster's Coercion, Boston Globe, June 25, 1998, at B4.

On Wednesday, July 22, 1998, the Boston Globe ran a major

cover story detailing the many instances in which the FBI had

apparently looked the other way while Bulger and Flemmi committed

crimes.  See Shelley Murphy & The Globe Spotlight Team, Cases

Disappear as FBI Looks Away, Boston Globe, July 22, 1998, at A1.

The piece recounted Bulger's 1976 extortion of a Dedham

restauranteur, an incident on which the article suggested the FBI

could easily have built a case against Bulger.  The FBI chose not

to build such a case, however, which, the article said, sent "a

powerful message to two of the region's more ruthless organized

crime figures: As long as you're with us, we won't bother you."

Id.  This meant that "[d]espite solid evidence indicating Bulger

and Flemmi were involved in murders, shakedowns, and drug dealing,

the FBI looked the other way throughout the 1970s and 1980s."  Id.

The article continued, "It made no difference who the victims were,

fellow wise guys or innocent people. . . .  In some cases, the

-15-

bureau even helped the gangsters by leaking information to them about ongoing investigations." Id. The Globe went on to list four "potential cases that went nowhere." This description appeared on that list:

> In 1984, a Boston police detective told Connolly that Bulger and Flemmi were trying to seize a liquor store owned by the detective's relatives with a "can't refuse" offer. But Connolly did not report the incident to superiors and, within days, Bulger sent word to the victims that he knew they had complained to the FBI and warned them to "back off."

Id.

The article went on to note Connolly's denial of any wrongdoing, but nevertheless suggested some impropriety, stating that "the record now shows that the deal -- protection for information -- left the bureau shortchanged, co-opted, and compromised." Id. In a more extended discussion of the liquor store extortion, the article asserted that "Connolly denied leaking the information" that the Rakeses were seeking police protection against Bulger, but noted that "it appears that Connolly made a unilateral decision to neither investigate the extortion nor pass it along to a supervisor." Id.

In August 1998, at roughly the same time that media coverage of all of these events came to an end, Dammers left the Boston area and moved to Gansevoort, New York. The record apprises us of only two articles appearing after the date of her move. In late September 1998, a Boston Herald article, albeit one buried

-16-

deep in the paper, noted that federal prosecutors had elicited testimony from Lundbohm "as part of a continuing effort to paint Connolly as a 'rogue' agent who overstepped his authority to aide [sic] Bulger and Flemmi," and which reported that "Connolly is the subject of a grand jury probe in Hartford investigating FBI misconduct." Ralph Ranalli, <u>Supervisor: Promises to Informants Tripped FBI</u>, Boston Herald, Sept. 30, 1998, at 14. A Globe article on September 30, 1998 reiterated in brief the story of Rakes' perjury trial and Flemmi's allegations that Connolly had given him a free pass to commit crimes, and reported Lundbohm's recent denials that he was aware of any connection between Connolly and Bulger when he turned to Connolly on the Rakeses' behalf.

After September 1998, there began a year-long period during which the record reflects no reporting on the relationship between the FBI and the Winter Hill Gang. So far as the record shows, new news did not emerge until September of 1999, with the publication of Judge Wolf's opinion in <u>Salemme</u> and the media coverage of that event. Because in this case we are concerned only with what the plaintiffs knew or should have known before May 11, 1999, we need not discuss this later coverage.

**D. Procedural History**

On May 11, 2001, Julie Dammers and Stephen Rakes each filed with the FBI the administrative notice and claim that the FTCA requires be filed with an agency if a potential plaintiff's legal claim is to be preserved. <u>See</u> 28 U.S.C. § 2401(b); 28 C.F.R.

§ 14.2. They received no reply after six months, at which point they were entitled to bring suit by filing a complaint in a federal district court. Each did so on May 8, 2002, in complaints to the U.S. District Court for the District of Massachusetts. The cases were assigned to Judge Young, who consolidated them, and discovery commenced. A long and hard-fought discovery battle ensued, and multiple delays were granted at the government's request, relating both to the burden of discovery and to the government's interest in withholding certain documents during the course of the trial of Stephen Flemmi, which at times ran concurrently with the proceedings below. As a result, the district court did not finally resolve the case until January 3, 2005. See Rakes v. United States, 352 F. Supp. 2d 47 (D. Mass. 2005).

The district court disposed of the case on the government's motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). The FTCA waives the government's sovereign immunity with respect to certain tort claims, see 28 U.S.C. § 1346, but imposes a two-year statute of limitations, see id. § 2401(b). The government moved to dismiss, arguing that this statutory period had run. The plaintiffs countered that they had had no way of learning of the facts underlying their claim until the opinion in Salemme was handed down, and that the limitations period had therefore started to run no earlier than September 1999.

The district court noted that, because the plaintiffs' claims were initially filed on May 11, 2001, the relevant question was whether the claims had accrued before or after May 11, 1999, the date two years prior to the filing date. The court found that, regardless of whether accrual of the claims had been delayed for some period after the injury, on the facts of the case the claims had accrued before May 11, 1999, and thus were barred. The district court also rejected the plaintiffs' arguments that the statute of limitations had not run on grounds of duress suffered by the plaintiffs or fraudulent concealment on the part of the FBI. Finding that the claims were all time-barred and that the court therefore had no jurisdiction over the suit, the district court dismissed. Rakes and Dammers each timely appealed.

On appeal, Stephen Rakes pursues only an argument that the district court erred in its application of the discovery rule, urging us to hold that, under the circumstances, his claims did not accrue until after May 11, 1999, the date two years prior to the plaintiffs' original administrative filing. Dammers forwards a similar argument, and also appeals from the district court's failure to find the statute of limitations tolled by reason of duress and fraudulent concealment and misrepresentation. We discuss each question in turn, and, finding no error, affirm the district court's dismissal of the case.

## II. Discovery Rule under the FTCA

### A. Legal Framework

Courts have no jurisdiction over claims against the federal government, except where the government has expressly waived its immunity. See United States v. Kubrick, 444 U.S. 111, 117 (1979). The FTCA is such a waiver. Id. In particular, the FTCA permits individuals to sue the government "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). The waiver effected by the FTCA is, however, closely circumscribed by the terms of the statute.

One of the restrictions the FTCA provides is a strict time limit for bringing suit. A provision of the statute, codified at 28 U.S.C. § 2401(b), provides in relevant part that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." Claims not brought within the two-year period fall outside of the courts' subject matter jurisdiction and cannot be heard.[6]

---

[6]We have often noted that the FTCA's statute of limitations provision must be "strictly construed." See, e.g., McIntyre v. United States, 367 F.3d 38, 51 (1st Cir. 2004); Skwira v. United States, 344 F.3d 64, 73 (1st Cir. 2003). We have derived this principle from the Supreme Court's warning in Kubrick that "in construing the statute of limitations, which is a condition of [the FTCA's waiver of sovereign immunity], we should not take it upon ourselves to extend the waiver beyond that which Congress

At issue in this case is the applicability of what has come to be called the "discovery rule," which governs claim accrual under the FTCA under circumstances where the fact or cause of an injury is unknown to (and perhaps unknowable by) a plaintiff for some time after the injury occurs, and which will sometimes dictate that a claim accrues well after the time of the injury. The Supreme Court first recognized a discovery rule in Kubrick, in the context of a claim for medical malpractice. This circuit has applied the discovery rule outside of the medical malpractice context, making of it a general rule.

Under this general rule, an action under the FTCA "accrues when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action." Attallah v. United States, 955 F.2d 776, 780 (1st Cir. 1992) (citing Kubrick, 444 U.S. at 121-25; Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 130 (1st Cir. 1987)).[7] The

---

intended." 444 U.S. at 117-18. While we must exercise care in deciding cases under the limitations provision at issue here, we must also be careful not to be more stinting in the interpretation of the provision than its language requires. This is because it is equally true that, just as the courts should not construe a waiver of sovereign immunity more broadly than Congress intended, "[n]either, however, should we assume the authority to narrow the waiver that Congress intended." Id. at 118 (citing Indian Towing Co. v. United States, 350 U.S. 61 (1955)); see also Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990) ("[W]e must be careful not to 'assume the authority to narrow the waiver that Congress intended,' or construe the waiver 'unduly restrictively.'" (quoting Bowen v. New York, 476 U.S. 467, 479 (1986))).

[7]There was a time when this circuit recognized a lex loci rule for the determination of the time of accrual for a cause of action under the FTCA. See Hau v. United States, 575 F.2d 1000, 1002 (1st

-21-

requirement that the injured party know, either actually or constructively, the "factual basis for the cause of action" means that a claim does not accrue under the FTCA until a person in the plaintiff's position, that is, one who knew or should have known as much as the plaintiff knew or should have known, would believe that he had been injured and would know "sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and [the] injury." Skwira, 344 F.3d at 78.[8]

Here, we are not asked to decide whether the plaintiffs actually knew sufficient information to trigger accrual of their claims. Instead, we are asked to decide this appeal on the basis of the objective component of the test. Cases such as this one

Cir. 1978); Tessier v. United States, 269 F.2d 305, 309 (1st Cir. 1959). As District Judge Woodlock wisely noted in a careful opinion some years ago, see McLellan Highway Corp. v. United States, 95 F. Supp. 2d 1, 11-13 (D. Mass. 2000), that time has passed. Since Kubrick, we have extended and uniformly applied the federal rule of accrual that case provided, with only the barest mention of the possibility that state law governed accrual, see Vega-Velez v. United States, 800 F.2d 288, 289 (1st Cir. 1986). This is enough to convince us that Kubrick changed our approach to accrual under the FTCA, even if this change passed without comment in our cases. Indeed, we think this panel is not empowered to revisit an approach heralded by Kubrick and applied so consistently in the cases since then. See, e.g., Callahan v. United States, 426 F.3d 444 (1st Cir. 2005); Cascone v. United States, 370 F.3d 95 (1st Cir. 2004); McIntyre, 367 F.3d 38; Skwira, 344 F.3d 64; Gonzales v. United States, 284 F.3d 281 (1st Cir. 2002); Attallah, 955 F.2d 776. In all of these cases, we applied the discovery rule without reference to state law, and we are bound by their approach.

[8]We note that a claim can accrue before the plaintiff knows that the injury was the result of a breach of a legal duty; it is for this reason that we speak of the plaintiff's knowledge of the "factual basis" and not of his knowledge of the legal sufficiency of the claim. Kubrick, 444 U.S. at 122.

turn on the question of what information a plaintiff "should have known." We start the analysis by asking what generally available information about the relevant facts the plaintiffs should be charged with knowing. We then ask whether a plaintiff who knew at least that much would have made a further investigation, and what such an investigation would likely have revealed.

The latter part of this inquiry is fairly straightforward. The more troublesome portion is the first step, at which we ask with what generally available information the plaintiff should be charged. We have touched on this difficult question in the past, in cases in which we described the question as, for example, "whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further." McIntyre, 367 F.3d at 52. But the mere "availab[ility]" of facts is not a full description of the standard we have applied. See, e.g., Cascone, 370 F.3d 95 (information in newspapers would not be imputed to plaintiff in part because, though available, newspapers circulated to small percentage of local population).

At some point, facts achieve a local notoriety great enough that the only practicable course is to attribute knowledge of them to people in a position to become familiar with them. The limitations provision in the FTCA is, like most statutes of limitations, in part a rule of repose: it permits the United States to rest easy after a period of time, knowing suits for long-past

wrongs are barred.  See Kubrick, 444 U.S. at 117.  In furtherance of this policy of repose, we charge plaintiffs with the knowledge the government reasonably ought to have expected them to have.  If the government, aware of the depth of the information available and of the breadth of that information's circulation, would reasonably have expected someone in a potential plaintiff's position to begin his inquiry, then the duty to inquire is triggered.

## B. A Threshold Question: Effect of Multiple Theories

In this case, Rakes and Dammers ask us to conduct this accrual analysis three times, each with respect to a different proposed explanation of the way in which the government caused their injury.  The plaintiffs' first theory is that the government caused their injury by emboldening Bulger and Flemmi, who relied on Connolly's protection and his assurances of immunity and who would not have taken the store had it not been for those assurances.  The second is that the government caused the injury when Connolly told Bulger that the Rakeses had gone to the police looking for protection.[9]  The third is that they were injured through the negligent failure of Connolly's superiors to supervise him properly.[10]  The plaintiffs postulate that claims under each of

---

[9]It is highly unlikely that this theory could, standing alone, justify relief: Bulger and Flemmi had manifested an intent to wrest ownership of the store from the Rakeses well before the couple sought help from Lundbohm.

[10]To the extent this claim arises from an allegation that the FBI failed to enforce certain of its internal guidelines in the supervision of Connolly, it is also of doubtful merit.  Whether a violation of the FBI's internal guidelines would give rise to a

-24-

these three theories might accrue separately, and that therefore, while a claim under one theory might be time-barred, a claim under another would still be viable.

We have cases that come out on both sides of this question. Our recent decision in Callahan held that the claim at issue in that case accrued when information vital to any theory of liability first emerged. See 426 F.3d at 452. Our earlier decision in McIntyre took a different approach, permitting a plaintiff to sue on the basis of information recently acquired, without determining whether the plaintiff would have had enough information to bring a claim for the same injury, under a different theory, at an earlier point in time. See 367 F.3d at 54.

Neither McIntyre nor Callahan should be viewed as setting forth a flat rule, or even a generally applicable rule subject to an easily stated exception. Whether a court will need to make separate calculations as to timeliness for different theories of injury pertaining to a single set of facts, or can simply rely on the accrual date of the earliest-accruing theory, depends very much on the circumstances of the case. In some instances, it will make sense to look at the injury as a single episode, while in others separate determinations of accrual dates will have to be made.

cause of action that individuals in the position of the plaintiffs here could assert would require some analysis, but it is far from obvious that a suit could be brought against the government on these grounds alone. See generally Alexander v. Sandoval, 532 U.S. 275, 289 (2001) (questioning whether "authorizing portion of [statute permitting agency to issue regulations] reveals [a] congressional intent to create a private right of action").

In this case we need not make a precise choice as to whether the three theories (only two of which are advanced by Rakes on appeal) should be analyzed separately from one another. On the present facts, once the plaintiffs had sufficient knowledge (actual or constructive) to trigger accrual of the emboldening theory, they also had sufficient knowledge to trigger accrual of the wrongful disclosure and negligent supervision theories.

Starting with the wrongful disclosure theory, Rakes and Dammers knew from the day Bulger told Rakes to have Lundbohm "back off" that someone had tipped Bulger off about their attempt to get help from the authorities. Even if a reasonable person would not at that time have suspected FBI agent Connolly -- Rakes and Dammers profess to have suspected Lundbohm initially -- a diligent plaintiff would have had grounds to suspect the FBI as an alternative source for the leak at the latest by the time such plaintiff also had reasonable grounds to suspect the FBI's wrongful emboldening of Bulger and Flemmi. That is, as soon as the plaintiffs should have suspected a corrupt relationship between the FBI and Bulger and Flemmi, they should also have suspected that the FBI could have been the source of the leak that they knew years earlier had occurred.[11]

---

[11]Although Rakes and Dammers argue that this case is identical to the first of the consolidated appeals considered in McIntyre, 367 F.3d 38, it differs in that it was clear from the outset that Bulger knew that Rakes and Dammers had sought help from Lundbohm, and Connolly was one of only two (or at most three) possible sources for that information. It is the high probability that an agent of the government was responsible for the leak, coupled with

The plaintiffs' third theory is that they were injured by the negligent failure of Connolly's superiors at the FBI to properly supervise him. This claim builds directly off of the claims concerning Connolly's own malfeasance; that is, the supervision was negligent, if at all, precisely because it failed to prevent Connolly's wrongful actions, including his emboldening of Bulger and Flemmi (which was accomplished in part by his alleged failure to report complaints like the Rakeses' to his superiors).

A negligent supervision theory of recovery is the sort that is normally considered, and often pursued, in any case where the primary injury was caused by a rogue lower-level employee. Certainly once the plaintiffs in this case suspected (or reasonably should have suspected) Connolly's own pervasive wrongdoing, they should also have suspected the reasonable possibility that he may have been enabled in this wrongdoing by poor, and even negligent, supervision by his superiors. Thus, this theory accrued at the same time as the two theories focused on Connolly's own alleged wrongful actions.

## C. Application of Accrual Analysis

Connolly's corrupt relationship with the FBI received widespread publicity prior to May 11, 1999, the date two years before the date on which the plaintiffs filed their claims. On the

the small set of possible government sources, that sets this case apart from McIntyre, where the plaintiffs could only speculate that there had even been a leak from an official source, to say nothing of the FBI specifically. See id. at 56-57.

basis of this publicity, we have no difficulty in concluding that Rakes and Dammers should have filed their administrative claims earlier, and that by not doing so they lost the opportunity to present those claims, which are now "forever barred." The district court correctly concluded that the discovery rule did not sufficiently delay accrual of the claims in this case.

We begin, as we have just explained, by asking what generally available information the government reasonably ought to have expected the plaintiffs here to have had. The trail of newspaper articles that began in June 1997 and continued through September 1998, offering coverage of the events surrounding Stephen Flemmi's testimony in the Salemme case, is the foundation of our conclusion. That trail begins with the revelation that Flemmi testified that "he and Bulger were all but given carte blanche to break the law." Nealon, Boston Globe, June 26, 1997, at A1. The Herald followed up in January 1998 with an article noting Flemmi's more shocking assertion that he had been "rewarded for his work for the agency with a free pass on murder . . . ." Ranalli, Boston Herald, Jan. 7, 1998, at 6. The Globe then reported that the FBI had been reluctant to assist another law enforcement agency in its attempts to go after Bulger and Flemmi on drug trafficking charges. See Nealon, Boston Globe, Jan. 9, 1998, at B1. Most vitally, the Globe ran a comprehensive article in July 1998, which accused the FBI, and Connolly in particular, of looking the other way while Bulger and Flemmi committed crimes. See Murphy et al., Boston

-28-

Globe, July 22, 1998, at A1.  That front-page article specifically discussed the extortion of the liquor store as one of the crimes the FBI had known of but declined to do anything about.  See id.

We do not know whether Stephen Rakes and Julie Dammers read any of these articles, and indeed they claim that they did not.  The question here, however, is whether the government was entitled to expect them either to have read them or to otherwise have become aware of their general purport.  While the government was not entitled to expect that Rakes and Dammers had read every article or knew, initially, of the details related in every piece published in any locally available paper, see Cascone, 370 F.3d 95, we conclude that the government was entitled to expect that, through the channels of communication that run among people connected through ties of neighborhood, community, friendship, and family, the general purport of these important and widely circulated articles would become known to people in Rakes and Dammers' positions.  This means that Rakes and Dammers should have had at least some notion that strong accusations of wrongdoing by Connolly had been made by Flemmi and others.

During the same period, a number of articles also appeared in the papers detailing Julie Rakes and Joseph Lundbohm's testimony during Rakes' perjury trial.  There is, of course, every chance that all of the information that came out during Rakes' trial was actually known to Stephen Rakes, and a good chance that all or some of it was known to Julie Dammers.  In any event, the

-29-

proceedings in that trial and media coverage of it are chargeable to both parties: the government was entitled to expect both Rakes, the subject of the prosecution, and Dammers, a key witness, to be generally aware of the goings-on at trial. Among the pieces of information of which the government could reasonably have expected both parties to learn were Lundbohm's apparent speculation that it was Connolly who had tipped off Bulger to the fact that the Rakeses were seeking police assistance, and Julie Dammers' own statement that Bulger had been under the government's protection.

For these reasons, both parties are charged with the knowledge that prior to September 1998, there had been much speculation that Connolly had sheltered Bulger and Flemmi and thereby emboldened them to commit crimes they would not otherwise have committed. Knowledge of this speculation, both in the press and at Rakes' own trial, was enough to trigger a duty to inquire. "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." McIntyre, 367 F.3d at 52 (quoting Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998)). Given a suspicion that Connolly was partially to blame for their woes, it was incumbent on Rakes and Dammers to search out relevant information about Connolly's role in emboldening Bulger and Flemmi, or risk losing their claims.

Had Rakes and Dammers undertaken such an inquiry, they would easily have found all of the newspaper accounts summarized here. Under these circumstances, we are compelled to conclude that their claim accrued by late 1998, after Rakes' own trial and the publication of the articles surrounding Flemmi's. This conclusion is supported by McIntyre, where, in the second of two consolidated appeals, we encountered a very similar set of legal claims, brought forward by the family of a man who had allegedly been murdered by Bulger. See McIntyre, 367 F.3d at 58 (plaintiffs "assert that the United States is vicariously liable for the actions of Connolly, Morris, and other agents, which provided Bulger and Flemmi with a 'protective shield' against prosecution and investigation that gave the two criminals the opportunity to commit crimes and emboldened them to do so, proximately causing" the harm alleged). We found the voluminous media coverage of many of the same events that concern us here, standing alone, enough to trigger the accrual of the plaintiffs claims by May 11, 1999, precisely the same date as is relevant in the present case.

We are convinced that, prior to May 11, 1999, Rakes and Dammers ought to have been aware of the speculation surrounding Connolly's relationship to the FBI, and that almost any inquiry on the question would have turned up enough information to convince them that this was likely the case. A reasonable person in either of the plaintiffs' positions, armed with this much knowledge, would believe both that he was injured and that the government caused the

-31-

injury.  We therefore hold that Rakes and Dammers' claims accrued more than two years before the date on which they filed their administrative complaints.

### III. Tolling Arguments

In addition to their arguments under the discovery rule, in the district court both parties argued that they should have been excused from filing their claims under putatively applicable doctrines of duress and equitable tolling.  These are both tolling doctrines because, under the right circumstances, they can stop the running of a limitations period after a claim has accrued.  On appeal, Stephen Rakes abandons his tolling arguments, but Julie Dammers continues to press her position.  After evaluating Dammers' claims, we conclude that the district court was correct in finding tolling inapplicable under the circumstances.

### A. Availability of Equitable Tolling Under the FTCA

There is at the outset a question whether equitable tolling can apply to FTCA claims at all.  This is because equitable tolling is not a rule about the accrual of a claim; equitable tolling instead halts the running of the clock once a claim has accrued.  While the rule governing delayed accrual fits comfortably with the statutory language, which makes no provision for determining when a claim accrues, tolling of the statute after accrual fits the language of the statute less comfortably.  Because 28 U.S.C. § 2401(b) provides no express exceptions to the two-year time limit that begins once a claim accrues, the question is

whether tolling is implicitly permissible.  The twin poles of the analysis we must undertake to answer the question are the Supreme Court's decisions in Irwin v. Dep't of Veterans Affairs, 498 U.S. 89 (1990), and United States v. Brockamp, 519 U.S. 347 (1997).

In Irwin, the Court considered whether the statute of limitations governing claims against the government under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., contained an implied equitable tolling provision.  The Court noted that:

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.  We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

498 U.S. at 96.  So saying, it announced that the "same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States."  Id. at 95-96.  This was in part because, the Court said, once Congress has waived sovereign immunity, "making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver."  Id. at 95.

Brockamp set the outer boundary of the rule announced in Irwin.  In Brockamp, the Court found that the limitations provision applicable to suits for tax refunds under 26 U.S.C. § 6511 contained no implied equitable tolling provision.  The provision at issue in that case set forth a detailed mechanism for determining which claims could be brought and under what circumstances, provided explicit exceptions and varied the amount of damages recoverable with the amount of time elapsed between overpayment and the filing of a suit.  The Court said of the section that "its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together, indicate to us that Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute that it wrote.  There are no counterindications."  Brockamp, 519 U.S. at 352.

Unlike the statute at issue in Brockamp, the FTCA's limitation provision speaks in clear and simple terms of its time limitation.  In this regard, it is far more like the provision at issue in Irwin.  The other circuits generally explicitly agree or simply take it as given that equitable tolling defenses are applicable in the context of the FTCA.  See, e.g., Motley v. United States, 295 F.3d 820, 824 (8th Cir. 2002); Perez v. United States, 167 F.3d 913, 917 (5th Cir. 1999); Lehman v. United States, 154 F.3d 1010, 1016 (9th Cir. 1998); Muth v. United States, 1 F.3d 246, 251 (4th Cir. 1993).

We note that Dammers in fact argues two distinct tolling doctrines in support of her position. Specifically, she argues that she was delayed in filing her claim because 1) she was under duress as a result of being threatened by members of the Winter Hill Gang, and 2) the government fraudulently concealed or misrepresented information vital to her claim. Both of these arguments drink from the same cup: they both propose that considerations of justice and equity require allowing an extension of the time for filing. Because of this similarity, we can see no reason to distinguish between the theories for purposes of determining whether they may be applied to delay the deadline for filing a federal claim under the FTCA. Consequently, we conclude that fraudulent concealment and duress are both available for tolling FTCA claims.

**B. Duress**

Dammers asserts that she was threatened by members of the Winter Hill Gang, and that she was afraid that bringing a lawsuit related to the loss of her store would provoke the gang members to harm her. Dammers' duress claim fails because Dammers has not alleged a sufficient causal nexus between the actions of the government or its agents and the duress she claims to have experienced. There is no contention here that the government was still, in May 1999, fostering Bulger and Flemmi's criminal behavior. Dammers' theory suggests that, because the government in effect turned Bulger, Flemmi, and their disciples loose on South

-35-

Boston, it was responsible for their conduct even beyond the period during which Connolly was supporting them.

The district court thought that, in order to find Dammers' claim tolled on the ground of duress, it was necessary for Rakes and Dammers to allege sufficient facts to permit an inference that the United States "used coercive acts of [sic] threats against them." Rakes, 352 F. Supp. 2d at 81. This may overstate the rule, for we think that a claim of duress levied against the United States during the period in which Connolly was actively engaged in protecting Bulger and Flemmi from oversight by law enforcement might conceivably have been made out. But it is true that in general, duress only makes sense as a response to a statute of limitations defense where the party asserting that defense is putatively responsible both for the original tort and for the plaintiff's continued fear of seeking redress. See Pahlavi v. Palandjian, 809 F.2d 938, 942 (1st Cir. 1987) (noting crucial importance of "allegations of wrongful conduct . . . that was causally related to the plaintiff's . . . fear").

In order to prevail under this rule, Dammers must be able to demonstrate duress caused by the government continuously until May 11, 1999. By that date, however, Connolly had long been out of the business of partnering with Bulger. "[E]quitable tolling is based on concealment or other misconduct by the defendant." Crawford v. United States, 796 F.2d 924, 926 (7th Cir. 1986). Once the misconduct ceased, and the United States began actively seeking

-36-

to frustrate rather than further the Winter Hill Gang's criminal activities, the government was, under the facts in this case, no longer responsible for ongoing threats made by members of the Winter Hill Gang. We therefore agree with the district court that Dammers' duress argument fails.

## C. Fraudulent Concealment & Misrepresentation

Dammers also contends that her claim is tolled because the government fraudulently denied any wrongdoing and otherwise deliberately failed to disclose certain facts known to it that would have enabled her to bring her claim. The rule governing fraudulent concealment is that "[t]he defendant raising the limitations defense must have engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his exercise of due diligence." Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 229 (1st Cir. 1990). The district court found that the claim was not tolled under this rule because plaintiffs had not acted with diligence in investigating their claims. The court rested its decision on the same grounds on which it had rested its discovery rule holding: that, because "Rakes and Dammers should have known of sufficient facts underlying their theories of liability prior to May 11, 1999 under the objective accrual test of McIntyre, it follows that Rakes and Dammers fail to meet the second prong of the fraudulent

concealment test because they were not acting with due diligence." Rakes, 352 F. Supp. 2d at 81.

The district court was correct. This reasoning means, we acknowledge, that a plaintiff whose argument for delayed accrual under the discovery rule has failed because she has not diligently investigated her claim will never be able to successfully argue that the statute of limitations has been tolled under a fraudulent concealment theory. This is because both doctrines require a plaintiff to exercise diligence in investigating a claim or risk losing it. See Callahan, 426 F.3d at 455. Of course, if even diligent investigation would have revealed nothing useful, the time for filing may be extended. Where, on the other hand, a plaintiff could have turned up needed information through investigation, but has failed to exercise the requisite diligence, she will not be able to avail herself of either doctrine, and will lose her claim. Such was the case here, and as a result, the statute of limitations was not tolled.

### IV. Conclusion

Stephen Rakes and Julie Dammers filed their claims too late, and the district court consequently had no jurisdiction over them. The district court's order dismissing the case for lack of subject matter jurisdiction is **affirmed**.