# United States Court of Appeals
## For the First Circuit

No. 05-2093

CATHERINE DEEGAN PATTERSON, INDIVIDUALLY
AND AS THE ADMINISTRATRIX OF
THE ESTATE OF EDWARD "TEDDY" DEEGAN,
AND YVONNE DEEGAN GIOKA,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA AND DENNIS CONDON,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Joseph L. Tauro, U.S. District Judge]

Before

Lipez, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Paul F. Denver, with whom Rossman & Rossman was on brief for appellants.
Joshua P. Waldman, Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Michael J. Sullivan, United States Attorney, and Robert S. Greenspan, Department of Justice, were on brief for appellee.

June 22, 2006

**CYR**, <u>**Senior Circuit Judge**</u>.  Catherine Deegan Patterson and Yvonne Deegan Gioka appeal from the district court judgment which dismissed their Federal Tort Claims Act (FTCA) complaint due to their failure to file within the applicable two-year statute of limitations.  <u>See</u> 28 U.S.C. § 2401(b).  We affirm.

<b>I</b>

<u><b>BACKGROUND</b></u>

In March 1965, two FBI informants – Vincent Flemmi and Joseph Barboza – murdered Edward "Teddy" Deegan in Chelsea, Massachusetts.  The Boston office of the Federal Bureau of Investigation (FBI) knew beforehand of the informants' plans, but did nothing either to stop the murder, or to prevent the subsequent wrongful conviction of two other men – Peter Limone and Joseph Salvati – for the Deegan murder.

In December 2000, the Boston Globe, in a series of sensational exposés of corruption within the Boston FBI office, revealed the FBI's complicity in the Deegan slaying.  For example, on December 21, 2000, the Boston Globe published an article titled "FBI REPORTEDLY HID KEY EVIDENCE, DOCUMENTS SHOW IT KNEW OF DEEGAN SLAYING PLOT IN '65," in which it reported: "Secret documents recently discovered in a Justice Department probe of FBI corruption appear to show that the bureau knew not only that the wrong men were convicted of a 1965 gangland murder, but also that agents were told about the plot two days before it happened and apparently did

nothing to stop it." During the following month, the story received national press coverage. On January 8 and 18, 2001, respectively, a Massachusetts superior court judge vacated the Limone and Salvati convictions, which actions likewise received local and national media attention.

On January 27, 2003, Teddy Deegan's brother Richard submitted an administrative claim for wrongful death under the FTCA against the United States, purporting to act as the "voluntary" administrator of Teddy's estate. As Massachusetts law does not recognize the authority of voluntary administrators to submit wrongful death claims, see Marco v. Green, 615 N.E.2d 928, 932 (Mass. 1993), the government denied Richard Deegan's administrative claim.

On December 5, 2003, Catherine Deegan Patterson (acting as the newly-appointed administrator of her father's estate) and her sister Yvonne Deegan Gioka submitted their own administrative claim to the government, seeking recompense both for their father's wrongful death and for infliction of emotional distress. Patterson was residing in New Hampshire, Gioka in Georgia. The government denied the Patterson and Gioka administrative claim as untimely, and on August 20, 2004, Patterson and Gioka timely filed the instant complaint in the United States District Court for the District of Massachusetts, asserting both wrongful death and emotional distress claims. The United States moved to dismiss the

complaint due to the failure of plaintiffs' December 5, 2003 administrative claim to satisfy the FTCA's two-year limitations provision. See 28 U.S.C. § 2401(b). In response, Patterson and Gioka argued, inter alia, that (i) Gioka's administrative claim was timely because she lived in Georgia, and did not learn of the FBI's involvement in her father's death until Catherine told her the news in the summer of 2002; and (ii) their December 2003 administrative claim, even if untimely, should nonetheless "relate back" to the date of their Uncle Richard's original and timely administrative claim on January 27, 2003.

The district court rejected both contentions and granted the government's motion to dismiss. The court pointed to the extensive national press coverage the Deegan story had received, then found that the Gioka claim had accrued more than two years prior to the filing of their December 2003 claim. The court also spurned the "relation back" argument on the ground that Richard, qua "voluntary administrator," was not authorized under Massachusetts law to submit a claim in behalf of the Deegan estate, thus the government had no reason or responsibility to investigate his wrongful death allegations. Patterson and Gioka now appeal from the dismissal order.

## II

## DISCUSSION

Because the parties do not dispute the predicate

-4-

jurisdictional facts, we review the grant of the motion to dismiss the complaint de novo. See Skwira v. United States, 344 F.3d 64, 72 (1st Cir. 2003), cert. denied, 542 U.S. 903 (2004); Fed. R. Civ. P. 12(b)(1). The FTCA permits individuals to sue the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," 28 U.S.C. § 1346(b)(1), but limits this waiver of sovereign immunity by prescribing that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues," id. § 2401(b). Thus, this limitations provision, ensuring that the government is promptly presented with a claim while the evidence is still fresh, is to be strictly construed in the government's favor. See United States v. Kubrick, 444 U.S. 111, 117-18 (1979); Skwira, 344 F.3d at 73. The two-year limitations provision commences upon the "accrual" of the claim, which occurs when the plaintiff knew or reasonably should have known (i) she was injured and (ii) the cause of the injury. See id.

## A.   The December 2003 Administrative Claim

The plaintiffs first contend that, since Gioka neither knew nor had reason to know of the FBI's involvement in her father's murder until the summer of 2002, the district court erred

in finding that the Gioka administrative claim, presented to the government in December 2003, was untimely under § 2401(b). The plaintiffs assert that the publicity about the case was centered primarily in the Boston area rather than national in scope, and that Gioka, who was in chronic poor health, lived in Georgia where she was not presumptively exposed to Boston media reports.

For purposes of calculating the § 2401(b) accrual date, the government need not demonstrate that plaintiffs had actual knowledge of the news of December 2000-January 2001; "'[w]here events receive widespread publicity, plaintiffs may be charged with [constructive] knowledge of their occurrence.'" Callahan v. United States, 426 F.3d 444, 452-53 (1st Cir. 2005) (quoting McIntyre v. United States, 367 F.3d 38, 60 (1st Cir. 2004)). Thus, the test is an objective one. See McIntyre, 367 F.3d at 52. The record demonstrates beyond serious dispute that the breaking news of the FBI's involvement in the Deegan murder did receive such widespread publicity. The Boston Globe and the Boston Herald published prominent accounts detailing the new facts relating to the FBI's role in the Deegan slaying, which were subsequently picked up by national wire services (API), nationally circulated news publications (inter alia, the New York Times, the Chicago Tribune, the Washington Post, the Los Angeles Times, and USA Today), and national network news (e.g., the CBS Early Show). Thus, the fact that Gioka resided in Georgia in December 2000-January 2001 is

insufficient to vitiate a finding that she should have learned of the news at that time.

Gioka also contends that her medical condition, which included cognitive problems arising from an automobile accident, a stroke, and Lyme disease, prevented her from making a reasonable inquiry and discovering the FBI's complicity in her father's murder. Assuming, without deciding, that § 2401(b) might permit such a "mental incapacity" exception,[1] Gioka has not alleged facts which would enable her to assert it. She does not contend that her illnesses rendered her mentally incompetent. Thus, at a minimum, she would have to point to evidence demonstrating that the degree of her mental incapacity rendered her "incapable" of discovering with the exercise of reasonable diligence – and then of

---

[1]Because § 2401(b) is a crucial condition to the United States' waiver of sovereign immunity under the FTCA, any exceptions to its limitation must be strictly construed in the government's favor. See Kubrick, 444 U.S. at 117-18. Although we have recognized some potential equitable exceptions to the FTCA limitations provision, see Rakes v. United States, 442 F.3d 7, 25 (1st Cir. 2006) (government-caused duress), Gioka does not assert that the government was in any way responsible for her mental conditions. Further, we previously have noted, albeit in dicta, that mental capacity may not be an appropriate equitable defense to § 2401(b). See, e.g., Nunnally v. MacCausland, 996 F.2d 1, 5 n.6 (1st Cir. 1993); Lopez v. Citibank, N.A., 808 F.2d 905, 907 (1st Cir. 1987). In any event, even if such a defense theoretically were available, it surely would be no less stringent than the rule which pertains outside the FTCA context, viz., "the traditional rule that mental illness tolls a statute of limitations [applies] only if the illness in fact prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them." See Miller v. Runyon, 77 F.3d 189, 191 (7th Cir. 1996); see also Lopez, 808 F.2d at 907.

understanding – the news of the FBI's involvement in her father's death.  See, e.g., Barnhart v. United States, 884 F.2d 295, 298-99 (7th Cir. 1989).

Gioka has failed to make the requisite showing.  She presents no medical reports detailing precisely how, or to what extent, her illnesses in fact impaired her ability to discover or comprehend the facts which were widely publicized in the national media.  The Gioka affidavit merely states: "At times, my concern about my health has been overwhelming and has left little room for other matters, including considerations of my father's death."  She does not specify at which "times" she was incapacitated, which leaves open the possibility that she was not significantly impaired, for example, in December 2000 and early 2001 when the Deegan story first broke in the press.  Further, even if we were to infer that her medical condition kept her bedridden or housebound, it apparently did not prevent her from accessing the media, since she admits to "a memory of seeing the very end of a CNN report about Mr. Salvati."  Finally, Gioka's sister, Catherine Patterson, admits that she had knowledge of the pertinent facts by the summer of 2001,[2] and it strains credulity to suggest that Patterson, knowing of her sister's alleged inability to conduct her own reasonably diligent inquiry, waited until the summer of 2002 to

_____

[2]Accordingly, Patterson does not argue on appeal that her December 2003 administrative claim was timely as to her own claims.

-8-

inform her sister of those facts. Thus, even assuming arguendo that mental incapacity could toll the accrual of an FTCA claim, Gioka has not provided a sufficient factual basis entitling her to that defense.

## B. The January 2003 Administrative Claim

By analogy to Federal Rule of Civil Procedure 15(c)(3), plaintiffs argue that their untimely administrative claim of December 2003 should "relate back" to the timely administrative claim submitted by their Uncle Richard, on January 27, 2003, for $100 million in damages, because the latter presented the same core allegations concerning the FBI's complicity in the wrongful death of their father. Further, they contend that the government would suffer no prejudice, since even if Richard had no authority under Massachusetts law as a "voluntary" administrator to file claims in behalf of his brother's estate, the FTCA notification requirement is not intended to be applied hyper-technically, but is satisfied if, as here, the government receives sufficient information to allow it to investigate the particular allegations of government misfeasance. See 28 U.S.C. § 2675(a); Kubrick, 444 U.S. at 356-57; Santiago-Ramirez v. Sec'y of Dep't of Def., 984 F.2d 16, 19 (1st Cir. 1993).[3] Thus, they maintain that the government is on notice

[3]The plaintiffs also state on appeal that, in order to avoid any unfair prejudice to the government, they intend that their claims relate back only to the extent of the damages set forth in Richard's original administrative claim, viz., $100 million.

to investigate even if the claimant – viz., Richard – had no legal standing to bring the eventual lawsuit against the government.

The district court held that the plaintiffs' claims could not "relate back" to Richard's January 27, 2003 claim because Richard – as a mere "voluntary" administrator – had no legal authority to act in behalf of his brother's estate, thus the government had no "incentive" to investigate the merits of his claim. Although this conclusion arguably may make sense from the policy standpoint that the government should not be made to commit its valuable time and resources to investigate a claim asserted by a party which lacks legal standing to pursue either settlement or litigation, the district court cited no supportive case authority for this proposition, and the legal question is neither straightforward nor well-settled. Indeed, we have noted that the express jurisdictional prerequisites of § 2675(a) are fully satisfied as long as the claimant states a claim of government wrongdoing and defines its damages in a sum certain, see Santiago-Ramirez, 984 F.2d at 19 ("This Circuit approaches the notice requirement leniently."), and other courts have rejected the additional "standing" requirement relied on by the district court, see, e.g., Free v. United States, 885 F.2d 840, 842-43 (11th Cir. 1989) (finding that an administrative claim filed by decedent's brothers and sisters, with no accompanying evidence that they had been appointed as legal representatives of the estate, nonetheless

satisfied the jurisdictional requirements of § 2675(a)); Ozark Air Lines, Inc. v. Delta Air Lines, Inc., 63 F.R.D. 69, 71 (N.D. Ill. 1974) (rejecting the government's argument that an administrative claim filed by a person who did not own the damaged property did not satisfy the jurisdictional requirements of § 2675(a)); see also Avila v. INS, 731 F.2d 616, 619-20 (9th Cir. 1984) (noting that "[a]ny other [presentment] requirements imposed by administrative regulations pursuant to section 2672 are not a bar to jurisdiction by the federal courts.")  In other words, plaintiffs urge that, though the claimant's lack of standing may present an opportunity to dismiss the case against the government at some juncture, it is not a jurisdictional bar rendering the administrative claim legally void ab ovo.  We need not resolve this thorny issue in the instant case.

Although the district court chose to bypass the question, the record demonstrates that Richard's January 27, 2003 administrative claim was not timely, and relation back (even if permissible) would therefore be futile.  See Global Naps, Inc. v. Verizon New England, Inc., 444 F.3d 59, 69 (1st Cir. 2006) (observing that appellate court may affirm on any ground supported by the record).  As we have already noted, most of the breaking publicity concerning the FBI's complicity in the Deegan slaying occurred in December 2000 and early January 2001, and became a prominent topic of public interest especially within the Boston

media market.

At this time, Richard was residing in that very Boston media market, viz., on nearby Cape Cod, Massachusetts. The plaintiffs rely on Richard's attestations that he was retired at this time, and heard nothing of these media reports. As we have noted, however, the test for FTCA accrual is not subjective, but objective, and in these particular circumstances, Richard must be assumed to have been exposed to the widespread in-state publicity concerning his own brother's murder. Moreover, assuming without deciding that Richard's retirement status might equitably toll the FTCA accrual date, the record does not contain any factual allegations to support the requisite inference that Richard's retirement was either so cloistered or debilitative that it prevented him from gaining access to these widespread media reports. Finally, and most importantly, the Boston Globe published an article on December 21, 2000 entitled "FBI REPORTEDLY HID KEY EVIDENCE, DOCUMENTS SHOW IT KNEW OF DEEGAN SLAYING PLOT IN '65," and the very next day, the Globe published an article entitled "SLAY VICTIM'S FAMILY TROUBLED BY REPORT ON FBI," in which a reporter interviewed Richard Deegan himself about the breaking news.

As Richard's administrative claim was submitted more than two years after he reasonably should have acquired knowledge of the FBI's involvement in his own brother's murder, it was untimely, and

thus the plaintiffs' attempts to have their claims relate back to that claim are plainly futile.

**Affirmed**.