TORRUELLA, Circuit Judge
(Dissenting).
The key difference between myself and the majority concerns the legal salience of the 1985 indictment, trial, and acquittal of Jimmy Flynn to the plaintiffs’ FTCA claims. In my view, the majority turns a blind eye to the fact that, because a criminal conviction can only be secured by an exceedingly high standard of proof, many of the acquitted are in fact guilty of the crimes with which they are charged, and that it was therefore entirely reasonable for the Donahue and Halloran families to continue to view Flynn as the responsible party despite his acquittal at trial. I believe that this fact carries significant weight in our FTCA accrual analysis. Our cases have made clear that what it takes to trigger accrual in the FTCA context depends, in part, on whether the injured *632 party already has a plausible explanation for his injury in hand. See Cascone v. United States, 370 F.3d 95, 105 (1st Cir. 2004). Because Judge Lindsay correctly appreciated the significance of both the prosecution of Flynn and the large span of years between the murders and the discovery of the government’s complicity, Donahue v. FBI, 204 F.Supp.2d 169, 177-78 (D.Mass.2002), I would leave undisturbed the district court’s judgment in favor of the plaintiffs.
I.
The Halloran estate filed an administrative claim with the United States on September 25, 2000, and the Donahue estate followed suit on March 29, 2001. Therefore, their claims are barred by the FTCA’s two-year limitations period only if they accrued prior to September 25, 1998 for the Halloran estate, and prior to March 29, 1999 for the Donahues. 28 U.S.C. § 2401(b). The majority holds that the plaintiffs’ FTCA claims accrued “no later than” September 2, 1998. Maj. Op. at 625. This was the day after a ruling by Judge Wolf publicizing statements by Stephen Flemmi acknowledging that he had been informed by the FBI of Edward Halloran’s attempt to provide evidence linking Flemmi and James “Whitey” Bulger to the 1981 murder of Roger Wheeler. Id. at 620.
For reasons laid out below, I believe that the plaintiffs’ claims did not accrue before March 30, 1999, which was several months before the district court issued its findings in United States v. Salemme, 91 F.Supp.2d 141 (D.Mass.1999), substantiated in relevant respect by Kevin Weeks in his plea agreement of July 2000.
A.
In the months leading up to his murder, a number of interested parties wanted Halloran dead, and for reasons unrelated to the information he provided against Bulger. This list included Jimmy Flynn and Jimmy Mantville, who in fact later went on to claim credit for the hit.[6] As we noted in McIntyre, “members of Winter Hill had made several attempts on [Halloran’s] life” before January 1982, when Halloran first approached the FBI with information about Bulger. McIntyre v. United States, 447 F.Supp.2d 54, 82 (D.Mass.2006) (emphasis added). The sources of the antiHalloran sentiment were not all related to his cooperation in the Wheeler probe. Flynn apparently had his own reasons for pique: during Flynn’s trial, the prosecution theorized that Flynn killed Halloran because Halloran had facilitated Flynn’s arrest on gun charges. Moreover, in a dramatic twist, Halloran himself unequivocally identified Flynn as his killer in a dying declaration. This provided strong evidence of Flynn’s role as the gunman. Cf. Giles v. California, 554 U.S. 353, 397, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (Breyer, J., dissenting) (explaining that a dying declaration is one made “when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth” (citations and internal quotation marks omitted)). The state bolstered the credibility of this identification when it prosecuted Flynn for the murders. So did the FBI, when it took steps to ensure that other information potentially linking Bulger to the murders was ignored or suppressed.
B.
This background is crucial to this case because it shows that the Donahue and
*633 Halloran estates were not similarly situated to the families of other Bulger victims who have raised claims before this court. See McIntyre v. United States, 367 F.3d 38 (1st Cir.2004) (discussing claims by estates of John McIntyre and Roger Wheeler); Callahan v. United States, 426 F.3d 444 (1st Cir.2005) (discussing claims by the estate of John Callahan). In particular, in those cases, no one had been charged and prosecuted for any of the murders, and Bulger was the prime suspect. Here, the Halloran and Donahue families held the sincere and reasonable belief that the murderer had been identified in May of 1982, when Halloran declared that Flynn was responsible, and the state subsequently prosecuted him, and they held this belief for sixteen years before learning the still more sordid truth. As Donahue’s widow later explained, “[e]ven after we watched the jury find Mr. Flynn not guilty, I assumed that he must have been the murderer but that somehow his lawyer had gotten him off.” Although Halloran’s widow “did not follow” Flynn’s trial, as it “was not going to bring Brian back,” she stated that she “always assumed that they charged the person responsible.”[7] Prior to the initiation of these lawsuits, the victims’ families were told by those investigating the murders, to the extent they were told anything at all, that Flynn was responsible. Because the plaintiffs had a significantly more plausible explanation for their injury in hand, it would have been reasonable for a person in these plaintiffs’ position to dismiss the apparently outlandish possibility of a causal link between the FBI and the Donahue/Halloran murders as ungrounded speculation, at least until more substantiated evidence of the connection emerged in the fall of 1999.[8]
While it is true that our FTCA cases require that we impute to the plaintiffs knowledge of events widely reported in the media, see Rakes v. United States, 442 F.3d 7, 20 (1st Cir.2006), it does not require us to insist that every plaintiff, however differently situated, draw the same conclusions from that knowledge. Indeed, our eases counsel precisely the opposite. See Cascone, 370 F.3d at 104. The majority appears to acknowledge as much, when it states that an FTCA claim accrues when “a prospective plaintiff has enough information to lead a reasonable person in his position to seek advice about a possible claim against the government.” Id. (emphasis added). Indeed, our cases require us to distinguish between plaintiffs who have good, even if not overwhelming, reason to suspect government malfeasance lying behind their injury, and plaintiffs who have no such reasons. Compare Skwira, 344 F.3d 64 (1st Cir.2003), with Cascone, 370 F.3d 95 (arising out of same pattern of criminal activity as Skwira). In Skwira, the defendants were aware that the government had exhumed the body of the deceased, had informed them that the cause of death listed on his death certificate was incorrect, and had initiated an investigation into the deaths occurring in the ward of the VA hospital where Skwira *634 died- — meaning, given the context, that it was overwhelmingly likely that the malefactor was a government employee. Skwim, 344 F.3d at 80. They had, moreover, expressed their “surprise” and “shock[ ]” that Skwira had died of a heart attack given that he was admitted to the hospital “only for treatment of his alcoholism.” Id. By comparison, in Cascone, we insisted that “the particular circumstances of individual plaintiffs can be relevant to” the accrual of their FTCA claim, and that “[t]he issue is whether a reasonable person similarly situated to the plaintiff would have known the necessary facts.” Cascone, 370 F.3d at 104 (emphasis in original). The deceased in Cascone was a seventy-four-year-old man with a history of serious heart disease, including a condition that was listed as a cause of death, making it “perfectly reasonable” for the plaintiffs to believe “that the pneumonia [for which he was admitted to the hospital] exacerbated his preexisting heart conditions or that his heart problems simply happened to flare up at that point....” Id. at 104 n. 12. Thus, despite press coverage of the crimes, we found that
[n]one of the Cascones had a reasonable basis to suspect that Cascone had died of anything but his preexisting heart condition, even if they should have known there was an investigation. “Where the plausible explanation [for death] is one of purely natural causes ..., there is initially no reasonable basis for supposing [misconduct]. It is not the purpose of the discovery rule to encourage or reward simple paranoia.”
Id. at 105 (citing Thompson v. United States, 642 F.Supp. 762, 768 (N.D.Ill. 1986)).
Just as the Cascones had no reason to suspect that the explanation for Michele Cascone’s death was false, and that in fact he had been murdered by a government nurse, the Donahue and Halloran families had no reason to suspect that the government’s insistence that Flynn was the gunman was a sham, and that in fact the government itself bore a great deal of the responsibility for the murders. It must be borne in mind in this context that the high standard of proof required to secure a criminal conviction means that factually guilty individuals will regularly be acquitted of their crimes. This suggests, in turn, that it would not have been reasonable to infer from Flynn’s acquittal that Flynn was actually innocent, and that someone else had committed the murders, particularly in light of the significant evidence implicating Flynn in the murders. The view that Flynn had simply beaten the charges was a rather more likely scenario than the far more outlandish and disturbing truth that emerged years later.
For these reasons, I do not believe the plaintiffs’ FTCA claims accrued until well past the March 29, 1999 cut-off date, as it was not until many months later — on September 15, 1999 — that Judge Wolfs Salemme decision came down, and that Winter Hill associates John Martorano and Kevin Weeks subsequently began testifying as to Bulger and Flemmi’s role in the murders.
C.
The majority raises a host of arguments to rebut this conclusion. First, the majority points to Patterson v. United States, 451 F.3d 268 (1st Cir.2006), and claims that the Donahue and Halloran families “lack even the evanescent firmness of a wrongful conviction.” Maj. Op. at 628. Respectfully, this is a misreading of Patterson. In Patterson, we rejected a plaintiffs argument that her FTCA claim only accrued when she was informed by her sister, in the summer of 2002, that the FBI was aware of plans to murder her father, *635 failed to take any actions to prevent it, and even allowed two innocent men to be convicted for the crime. Patterson, 451 F.3d at 269-70. But, pace the majority, Patterson does not stand for the proposition that a settled and justified belief in someone else’s guilt can have no relevance to the accrual of an FTCA claim. Patterson did not address that issue at all. Given the newly discovered evidence that emerged in that case, the plaintiffs were on notice that the original defendants were factually innocent, and that someone else had committed the murder (as it turns out, Flemmi’s brother Vincent). See generally Commonwealth v. Peter J. Limone, 2001 WL 30494, 2001 Mass.Super. LEXIS 7 (Mass.Super.Ct. Jan. 8, 2001). In contrast, the Donahues and Hallorans knew only that a jury had not been confident in Flynn’s guilt beyond a reasonable doubt. This is a far cry from being told that Flynn was innocent, and that someone else, perhaps with the tacit approval of the FBI, had committed the murders.
Moreover, the effect of the wrongful convictions on the accrual of the plaintiffs’ FTCA claim played no role in the Patterson court’s reasoning, for good reason. The Massachusetts Superior Court vacated the wrongful convictions on January 8 and 18, 2001. However, the plaintiffs did not file their claims until January 27, 2003, more than two years later, and so no claim of reasonable reliance on the Limone and Salvati convictions was in the offing. See Patterson, 451 F.3d at 269. Instead, the plaintiffs raised arguments of lack of notice and medical disability. And, although the court rejected those arguments, pointing inter alia to the December 2000 publicity surrounding the news of the FBI’s corrupt role in the murder and wrongful convictions, it made clear that what was “most important ]” to its analysis was the fact that one of the plaintiffs had himself been interviewed about these developments in December 2000, and therefore clearly knew of and, apparently, was “troubled by,” the allegations. Id. at 273. This, of course, was enough to start the FTCA clock ticking. Cf. Merck & Co., Inc. v. Reynolds, - U.S. -, 130 S.Ct. 1784, 1789-90, 176 L.Ed.2d 582 (2010) (holding that a cause of action accrues “when the plaintiff did in fact discover,” or “when a reasonably diligent plaintiff would have discovered, ‘the facts constituting the violation’ — whichever comes first.” (emphasis added)).
Second, the majority also seeks to discredit the district court’s emphasis on the lengthy period of time between the murders and the revelations of FBI corruption. The majority does so by relying on McIntyre, Maj. Op. at 627, for the proposition that the extensive interval between the murders and the Salemme revelations has no bearing on the reasonableness of attributing knowledge of the latter to the plaintiffs. McIntyre involved, in pertinent part, claims arising out of the murder of Roger Wheeler in 1981. The court rejected the Wheeler estate’s claims as untimely, reasoning that the widespread publicity from the Salemme hearings put the Wheelers on notice of their claims against the government. McIntyre, 367 F.3d at 58-59. But, again, the majority ignores the fact that the Donahue and Halloran families are differently situated from the Wheelers in one absolutely central respect. Unlike the Wheelers, the Donahue and Halloran families had been told that the murderer had been identified, and by bringing Flynn to trial, the government represented that they were confident — indeed, confident beyond a reasonable doubt — in his guilt. At no point after Flynn’s acquittal did the government give the plaintiffs cause to think otherwise. According to Donahue’s widow, “every time [she] asked the FBI for information *636 regarding [her] husband’s murder, [she] was told that the FBI had none.” (Emphasis added). (Not content with mere stonewalling, at one point FBI agents accused her of having an affair, which the agents suggested was the cause of the murder ). The Wheelers had no officially sanctioned culprit on whom to pin responsibility for their injury. The Halloran and Donahues did. This fact changes the significance of the many intervening years— from years spent seeking unforthcoming answers to an unsolved riddle, to years in which an officially sanctioned belief hardens into taken-for-granted fact.
Third, under the rubric of “generally available information,” the majority points to John Morris’ testimony during the Salemme hearings, as well as the ensuing media publicity. See Maj. Op. at 625-27. However, Morris’s revelation on April 22, 1998 that Connolly had leaked news of Halloran’s cooperation to Bulger did not call into question the reasonableness of the families’ belief that Flynn was the killer. Morris’s testimony provided a previously undisclosed motive for Bulger to kill Hallo-ran, but others, including Flynn, shared a similar motive. Cf. McIntyre, 367 F.3d at 56 (“One could not reasonably infer, for purposes of FTCA accrual, from Morris’s testimony about Halloran that the FBI told Bulger and Flemmi about every informant in their organization or that Bulger and Flemmi killed every person that they knew to be informing against them, regardless of the circumstances.”). Where Bulger was but one of a number of individuals with a motive to kill Halloran, where Halloran identified one of those non-Bulger individuals in a dying declaration, and where the government insisted on the same at trial, the bruiting about in the papers of a possible Bulger-FBI-Halloran connection, some sixteen years after the fact, cannot be deemed sufficient to set the limitations clock ticking.
The majority notes that “one need not have irrefutable proof’ that an injury was caused by the government in order to file an administrative claim under the FTCA. Maj. Op. at 627 (citing Skwira). That much is true. But that is not yet to say quite enough. The Donahues and Hallorans had every reason to believe, and had in fact believed for sixteen years, that someone other than Bulger had committed the murder. The government insisted as much by bringing Flynn to trial and subsequently took no steps to disabuse the plaintiffs of this belief, even though the facts showing its falsity were locked away in the brains of recalcitrant government agents. So although the level of proof necessary for an injured party to file a claim under the FTCA is surely not “irrefutable,” given the situation in which the Donahues and Hallorans found themselves, it was nevertheless substantial, and it was certainly more substantial than in cases where “overwhelmingly, the most likely malefactor was one of a very limited group of government employees,” and involved “the same small cast of characters,” McIntyre, 367 F.3d at 53. It makes a crucial difference to our FTCA analysis, in other words, that the plaintiffs had a “plausible explanation for death” that does not provide a basis “for supposing [government] misconduct.” Cascone, 370 F.3d at 105 (internal quotation marks and alterations omitted).
II.
The majority rejects the plaintiffs’ claim of fraudulent concealment as well, on grounds that the plaintiffs “failed to exercise due diligence in investigating the possibility of a claim.” Maj. Op. at 629. The gist of the majority’s argument here is that, even though the Halloran and Dona *637 hue estates did not actually know about the media reports about the FBI-Bulger link, they should have, and they should therefore also have conducted further inquiry into the matter, a duty imposed purely by the fictional knowledge of newspaper articles that the court attributes to them — and even though had they actually conducted such an inquiry, the only direction it would have led them is down the garden path.
I first note that the majority’s reasoning under this heading depends crucially upon its central holding, that the Halloran and Donahue estates may be attributed with knowledge of the media reports of an FBI-Bulger link to the murders. This is because it is only if the presumption of such knowledge is reasonable that it makes sense to describe a failure to institute further investigations as some kind of shirking of an epistemic duty. If, as I have argued, the Halloran and Donahue estates have a perfectly reasonable explanation for their ignorance — clothed in the figure of one Jimmy Flynn — then there is no duty of further investigation there to be shirked.[9]
Secondly, it is clear that any efforts by the Halloran and Donahue estates to further corroborate the media reports of a FBI — Bulger link to the murders would have been pointless. The government was at this point pursuing a strategy of dissimulation, denial and stonewalling. Judge Wolf noted in his Salemme opinion that government intransigence during the hearings meant that it remained unclear whether Flemmi and Bulger played any role in Halloran’s murder. Salemme, 91 F.Supp.2d at 212-13. The government withheld key documents from the defense relating to Halloran’s murder, in violation of discovery obligations, until after Morris had testified, thus preventing cross-examination of Morris as to their content. See United States v. Flemmi, 195 F.Supp.2d 243, 249-50 & n. 39 (D.Mass.2001) (detailing FBI misconduct during the Salemme hearings). Indeed, not only did the government fail to produce the FBI reports containing Hallo-ran’s allegations against Bulger and Flemmi during the Salemme hearings, they insisted during the discovery phase of this case that it was “not known how Bulger and Flemmi obtained information that Halloran was providing information to the FBI,” and noted that there were other reasons why members of Winter Hill, and its hangers-on, might have wanted Halloran dead. This disingenuous profession of ignorance was made in 2005— years after the publication of Salemme and Martorano and Weeks’ confirmations of the FBI’s complicity in the murders. See United States v. Connolly, 341 F.3d 16, 23-24 (1st Cir.2003) (describing Weeks and Martorano’s testimony at FBI agent John Connolly’s trial). Taking the government at its word here means that the plaintiffs — who, of course, had far less access to the relevant information — cannot *638 be charged with uncovering corroborating evidence in the exercise of “due diligence.” See Attallah v. United States, 955 F.2d 776, 780 (1st Cir.1992).
III.
Unsurprisingly, the lurid story of the FBI’s decades-long entanglement with Bulger and Flemmi has given this court plenty of opportunity to consider these issues. Our cases on this topic exhibit an arguably gratuitous hostility to FTCA claimants. See Skwira, 344 F.3d at 69 (holding that a plaintiffs wrongful death claim was untimely, even though at the date we held their claim to have accrued, the plaintiffs could not possibly have discovered that the decedent had been poisoned as there were no known scientific methods for testing for the drug used, and, moreover, the plaintiffs were regularly told by a government employee that autopsy results were consistent with death by natural causes). This hostility is particularly indefensible given that the heightened pleading burden plaintiffs bear under Ashcroft v. Iqbal, - U.S. -, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009), means that plaintiffs who are unable to corroborate their claims are likely to find themselves on the receiving end of a motion to dismiss. The majority suggests that FTCA plaintiffs may file a claim with insufficient corroborative evidence and then request the agency to hold the claim in abeyance as further investigation proceeds. Maj. Op. at 627, citing Skwira, 344 F.3d at 81-82 n. 17. The statutory text neither imposes such a duty on FTCA plaintiffs, nor requires agencies to agree to such requests. See 28 U.S.C. §§ 2671-80. It is unclear that this paragon of lawyerly procedure — sue now, ask questions later— would occur to any but the most litigiously-minded or chronically risk-averse layman. Moreover, by requiring premature filing of FTCA claims, the majority’s position may well require lawyers to act in contravention of both the pleading standards established by the Federal Rules of Civil Procedure and their ethical obligations.[10]
Despite our warning in Cascone that our FTCA jurisprudence should not “reward or encourage simple paranoia” among plaintiffs, our cases may give the impression of counseling precisely this — namely, that injured parties should bring their claims as soon as they learn of uncorroborated speculation in the papers or even the mere “rumor of a claim,” for fear of later discovering their claims to be forever barred. Because it in effect lowers the bar for accrual to a “mere hunch, hint, suspicion, or rumor of a claim,” McIntyre, 367 F.3d at 52, today’s decision is another step down this paranoia-inducing road. Our cases, stingy as they already are, do not require this result, nor should rex non potest peccare,[11] when applied in the twenty-first century, allow for such an unjust *639 outcome which rewards official uncontrolled wickedness. I dissent.

. According to information later obtained from Weeks, Mantville claimed responsibility for Halloran’s murder "even though he had nothing to do with it.” Weeks reported that Mantville told him after the murder, "We finally got him,” meaning Halloran.

. Indeed, until the publication of Salemme in the fall of 1999, Donahue’s widow testified that she had never "... considered or had reason to consider that my own government, the same people who arrested and prosecuted Mr. Flynn, could have somehow been involved in my husband’s murder.”

. The majority avers that in focusing here on who committed the murders, we have lost sight of the fact that "this is a suit which alleges wrongful disclosure, not wrongful death.” Maj. Op. at 628 n. 5. Let me therefore be clear: the claim is that the reasonable belief in Flynn’s guilt means that the plaintiffs were not, in the exercise of due diligence, required to give credence to prima facie outlandish speculations in the papers that an internal leak at the FBI caused the murders.

. I note that even if our cases require attributing knowledge of widely disseminated media reports, this is because this is "the only practicable course,” given the function of a statute of limitations as a "rule of repose.” Rakes, 442 F.3d at 20. It is not because it is somehow objectively unreasonable for people in the plaintiffs' position — whose husbands and fathers had been brutally murdered, and who were left to raise small children on their own — to refuse to re-open an inquiry long thought closed. Re-opening such an inquiry would carry significant psychic costs, and we need not go so far as to imply that refusing to bear those costs is somehow per se unreasonable, even if we must, for other reasons, nevertheless attribute the corresponding knowledge. The suggestion that this case may be decided under the rubric of the plaintiffs’ unreasonable shirking of epistemic duties is simply to add insult to injury. .

. Fed.R.Civ.P. Rule 11(b) provides that “[b]y presenting to the court a pleading, written motion, or other paper ... an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: ... (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation and discovery.” ABA Model Rules of Professional Conduct Rule 3.1 provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.”

. "The King can do no wrong.” See William Blackstone, I Commentaries *237.